## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JAMES KLEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 8035 |
| v. | ) | |
| | ) | Magistrate Judge |
| NEWLY WEDS FOODS, INC., | ) | Maria Valdez |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |
| NEWLY WEDS FOODS, INC., | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES KLEIN, | ) | |
| | ) | |
| Counter-Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## DISCUSSION

Plaintiff James Klein was terminated from his position as Director of Research & Development by Defendant Newly Weds Foods, Inc. ("Newly Weds"). Klein brought suit, alleging a violation of the Age Discrimination in Employment Act ("ADEA"), arguing that he was terminated and immediately replaced with several younger individuals under the guise of company reorganization. [Doc. No.

1]. Newly Weds argues that age played no role in Klein's termination and that there is no evidence that would support such a claim. Newly Weds asserts that Klein's employment ended when it was determined that the position he was deemed most capable of filling in the reorganized department was simply not a viable position for how Newly Weds supported its customers. Newly Weds has moved for summary judgment. [Doc. No. 76].

Newly Weds has also filed counterclaims against Klein for breach of contract and violation of the Illinois Trade Secret Act. [Doc. No. 43]. Klein has moved for summary judgment [Doc. No. 95] on Newly Wed's counterclaims, arguing that Newly Weds has failed to establish any damages and failed to provide any evidence that Klein used any of its documents or disclosed any of the material in controversy to anyone but his attorney. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Defendant's Motion for Partial Summary Judgment [Doc. No. 76] is granted and Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims [Doc. No. 95] is dismissed without prejudice.

## BACKGROUND[1]

Plaintiff Klein was hired by Defendant Newly Weds in 1997 and worked in the Research & Development ("R&D") department until he was terminated, at the age of 65, in August 2015. [*Pl.'s Resp. to Deft.'s SOF* at ¶ 2]. At the start of 2015, Newly Weds hired Dirk Beekman to succeed Lynn Theiss, long-time Vice President

---

[1] The following facts are taken from the parties' Local Rule 56.1 Statements ("SOF") and are uncontested unless otherwise noted.

of R&D. [*Deft.'s SOF* at ¶ 4]. Although Klein denies that it was "widely understood" that Beekman would reorganize the R&D department, Newly Weds asserts that one of Beekman's responsibilities in 2015 was to make determinations as to how to better manage the R&D department. [*Pl.'s Resp. to Deft.'s SOF* at ¶¶ 4, 5]. Prior to Newly Weds hiring Beekman, Klein had discussions with Theiss regarding the need to improve headcount through improved workflow between the Regulatory & Technical Information Systems ("RTIS") Group and the rest of R&D. [*Deft.'s SOF* at ¶ 6].

As an initial step in the R&D reorganization, on June 29, 2015, Kendle Gorski transitioned to the newly created position of Raw Material Information Manager in the RTIS area of R&D. [*Id.* at ¶¶ 7, 10]. The Raw Material Information Group's function was to ensure the acquisition, assimilation, and maintenance of accurate raw material and vendor information. [*Id.* at ¶ 7]. As a managerial position, Gorski's position was a step below Klein's position as a director, with Gorski's starting salary at $80,000 and Klein's base salary at the time being $137,534.99. [*Id.* at ¶¶ 10, 11].

Three individuals who previously reported to Klein handling data were shifted to Gorski as part of this move. [*Id.* at ¶ 7]. This data function had been Klein's responsibility from 2011-2014. [*Id.* at ¶ 8]. Klein agreed that it would be a "reasonable decision of management" to have the data handled by the Raw Material Information Group and that he did not believe that he would have been better suited to take on those responsibilities than Gorski. [*Id.* at ¶ 9].

During this time, as part of the reorganization, Beekman and Klein were discussing having Klein focus on a new long-term innovation. [*Id.* at ¶ 13]. The discussion included talks of shifting Klein's clerical responsibilities to RTIS to free up Klein to do other things. [*Id.* at ¶ 13]. Beekman and Klein continued to discuss Klein's expanded job duties and Klein believed that Beekman was "very positive" toward him. [*Id.* at ¶ 14].

Early in the reorganization process, Beekman determined that Klein's strength was innovation and coming up with new ideas for the company, and Klein agreed. [*Id.* at ¶ 15]. Klein and Beekman discussed a position where Klein could do a good job working on basic, long-term research. [*Id.* at ¶ 19]. The parties disagree as to what role Beekman envisioned for Klein: a singular role in innovation, or a multi-faceted role that encompassed innovation, cost savings, and other duties. [*Pl.'s Resp. to Deft.'s SOF* at ¶ 20]. Newly Weds believes the position that Beekman envisioned played to Klein's strength in coming up with new ideas, whereas Klein believes that Beekman envisioned a broader role than just simple innovation. [*Id.* at ¶ 20].

Beekman created a Continuous Improvement Group, whose function was to find areas of waste where money could be saved by doing things smarter. [*Deft.'s SOF* at ¶ 22]. The group would focus on savings in procurement, ingredients, and operations, including immediate manufacturing costs and savings. [*Id.* at ¶ 22]. Beekman selected George Kelecich, who was 52 at the time, to run this group. [*Id.* at ¶ 23]. Klein alleges that he was performing the role of continuous improvement

and cost savings as head of the "Ingredient Technology Group," and once he was terminated, the group was renamed the "Waste Group" and, later, the "Continuous Improvement Group." [*Pl.'s Resp. to Deft.'s SOF* at ¶ 22]. Klein alleges his job was given to Kelecich, as were his remaining direct reports, John Schranz and Linfeng Wang, who later performed essentially the same work under Kelecich. [*Id.* at ¶ 22]. Klein further alleges that he was fired and the position was given to Kelecich to create a vacancy for Craig Lawson, a manager under Kelecich who was 40 at the time, who was elevated to R&D Director. [*Id.* at ¶ 23]. Klein understood that the Continuous Improvement Group would be working with plant operations to reduce waste in plants. [*Deft.'s SOF* at ¶ 24]

Kelecich had worked for Newly Weds longer than Klein had. [*Id.* at ¶ 25] He started in operations and had been a production supervisor. [*Id.* at ¶ 26]. After Kelecich moved from operations to R&D, he continued to have regular interactions on a weekly or daily basis with Newly Weds' plant managers. [*Id.* at ¶ 27]. He handled any item that involved R&D and operations that related to product development. [*Id.* at ¶ 27]. Klein acknowledged that Kelecich had a great relationship with operations, was good with people, and was strong in administration. [*Id.* at ¶ 28]. Klein had never worked in operations at Newly Weds. [*Id.* at ¶ 30].

In August 2015, Carol Bagley, a former Newly Weds employee, had gone to Newly Weds to visit a friend when she bumped into Newly Weds' owner, who asked her if she would be interested in coming back to work for the company. [*Id.* at ¶ 34].

Bagley previously worked at Newly Weds from 1988 – 1996 in a variety of roles, including food scientist, R&D manager, regulatory compliance manager, and financial analyst. [*Id.* at ¶ 33].

Bagley was interested in a position with Newly Weds and subsequently interviewed with an HR manager. [*Id.* at ¶ 34]. She received a job offer and was pretty confident that her contact with Newly Weds' owner would result in the offer. [*Id.* at ¶ 34]. As part of the Continuous Improvement Group, Beekman assigned Bagley, who was 50 at the time, to work under Kelecich with respect to the financial aspect of continuous improvement. [*Id.* at ¶ 32]. Bagley's position was a newly created managerial position with a salary of $80,000 – a lower position and salary than that of Klein's. [*Id.* at ¶¶ 35, 36]. While the parties agree it was a new position, Klein alleges that Bagley's job functions had been performed by various individuals, including Klein himself, throughout the company's history. [*Pl.'s Resp. to Deft.'s SOF* at ¶ 36]. The parties further disagree that Bagley did not pick up any of the projects that Klein had been handling. Klein alleges that Schranz and Wang were immediately reassigned to Bagley following Klein's termination and continued to perform the same work under Bagley that they had performed under Klein. [*Id.* at ¶ 37].

Prior to the reorganization, Kelecich had managed some of Newly Weds' remote R&D locations. [*Deft.'s SOF* at ¶ 38]. Newly Weds asserts that with Kelecich being slotted to head the Continuous Improvement Group, Beekman selected Craig Lawson to take on the functions that Kelecich had managed involving R&D at

plants in and outside of Chicago. [*Id.* at ¶ 39]. Klein disagrees, alleging that Kelecich was reassigned to the position of Continuous Improvement Director so that Lawson could be promoted to Kelecich's old position – asserting that the only difference between Lawson's new position and Kelecich's former position was that Lawson was now responsible for overseeing five plants instead of four. [*Pl.'s Resp. to Deft.'s SOF* at ¶ 39]. Klein had only managed one remote location for Newly Weds during 2009 – 2010 and admitted that he was not better suited for this position than Lawson. [*Deft.'s SOF* at ¶ 40].

Klein believed that Debra Polcyn had picked up some of his responsibilities for budgeting in the reorganization, but he also noted that she had become responsible for talent acquisition and working with universities on interns. [*Id.* at ¶ 41]. Polcyn, who turned 60 in 2015, moved from a position involving R&D for national chain accounts – a position that was eliminated – to becoming the director of Technical R&D, running the R&D sensory lab and reporting directly to Beekman. [*Id.* at ¶ 42].

The parties disagree as to the position that Beekman envisioned for Klein. [*Pl.'s Resp. to Deft.'s SOF* at ¶ 43]. Newly Weds asserts that it became apparent to Beekman that it would be like "pushing a giant boulder up a hill" because "95%" of everything done at Newly Weds was customer driven. [*Id.* at ¶ 43]. Klein asserts that, unbeknownst to him, as early as April 2015, Beekman had placed him on a "6 month test" and threatened to replace him; and, by June 2015, had requested severance figures for Klein. [*Id.* at ¶ 43]. Klein agreed with Beekman's

characterization that Newly Weds is a "customer-oriented" company. [*Deft.'s SOF* at ¶ 44]. The parties disagree that, as the reorganization progressed, the feedback from Vice Presidents in other areas of Newly Weds was that Beekman's vision for Klein's new role was not what Newly Weds was, would not work out, and was simply "not in Newly Weds DNA." [*Pl.'s Resp. to Deft.'s SOF* at ¶ 45]. When Klein was terminated, Beekman told him that "the reorganization sometimes does not go the way people think it's going to go." [*Deft.'s SOF* at ¶ 46].

Newly Weds offered Klein a severance package prior to his termination, which he declined. [*Id.* at ¶ 47]. Klein did not believe he was being discriminated against until he was terminated. [*Id.* at ¶ 48]. In discovery, Klein identified the following individuals as being similarly situated to him, but treated more favorably: George Kelecich, Craig Lawson, Kendle Gorski, Carol Bagley, and Debra Polcyn. [*Id.* at ¶ 49]. At the end of 2015, Newly Weds' R&D department had four directors or senior directors who were over the age of 60. [*Id.* at ¶ 50]. Sixty employees were affected by the reorganization of the R&D department – which included employees being promoted, reassigned to another supervisor, or otherwise had their duties and responsibilities changed in an effort to have the Department run more efficiently. [*Deft.'s Resp. to Pl.'s Sup. SOF* at ¶ 1].

Prior to Klein's termination, he was allowed to work from home with a computer provided by Newly Weds. [*Pl./Counter-Deft.'s SOF* at ¶ 8]. In 2013, Klein began using an external hard drive to back up his laptop onto CDs, and periodically backed it up. [*Id.* at ¶ 9]. He had roughly 100 CDs at his home, with many of them

being encrypted, preventing him from accessing any documents on them without his work laptop. [*Id.* at ¶¶ 12, 13]. Klein admitted that the documents he retained could contain Newly Weds' trade secrets and confidential information. [*Deft.'s/Counter-Pl.'s Supp. SO*F at ¶ 9]. Klein often brought home his external drives he used to back up his laptop so that he could access documents when worked from home. [*Pl./Counter-Deft.'s SO*F at ¶ 14]. He kept the CDs at home because his office did not have locks on it and claims that he had forgotten they were at his home. [*Id.* at ¶¶ 16, 17].

Upon Klein's termination, he was given materials concerning the termination, including a severance agreement and a letter which, among other things, requested that he return any company work papers that he had in his possession. [*Id.* at ¶¶ 19, 20]. Klein also signed a Non-Disclosure/Confidentiality Agreement ("NDA") at this time. [*Deft.'s/Counter-Pl.'s Supp. SO*F at ¶ 1]. Klein immediately retained legal counsel to represent him in connection with his termination. [*Pl./Counter-Deft.'s SO*F at ¶ 25]. Newly Weds never contacted Klein about whether he had returned company documents, but sought information on it in discovery requests served on Klein in April 2017. [*Id.* at ¶¶ 26, 27]. Klein answered the request that he had "maintained backup hard-drives of work he performed for Newly Weds during his 18 years of employment. That information has been stored on CDs and is available to be examined at the offices of Plaintiff's attorneys." [*Id.* at ¶ 29].

During the course of litigation, Klein provided his attorneys with the papers he had received at the time of his termination, the hard drive, and the CDs with the backups of documents from his work laptop. [*Id.* at ¶ 30]. It is disputed as to whether Klein has used the documents in question for any work purpose, has disclosed any of the documents to someone other than his attorney, or has any of Newly Weds documents in his possession. [*Id.* at ¶ 31]. Klein alleges that, at all times since his termination, the documents have either sat "undisturbed" in his home or his attorneys' offices and have been reviewed only in connection with this litigation. [*Id.* at ¶ 32].

Klein admitted the relevant provisions of the NDA, including that Newly Weds could enforce the agreement by injunction proceedings. [*Deft.'s/Counter-Pl.'s Supp. SOF* at ¶ 3]. In addition to signing the NDA, Klein acknowledged receiving Newly Weds' Employee Handbook that contained a restriction regarding the use of confidential and proprietary information. [*Id.* at ¶ 4]. Newly Weds alleges that Klein received a letter in connection to his termination, reminding him of his obligations under the NDA and stating that he was expected to comply with the terms, although, Klein alleges that he received the letter, but did not read it. [*Id.* at ¶ 5]. Klein also received an Employment Termination Agreement from Newly Weds indicating, among other things, that he had returned all company property including company files and documents. [*Id.* at ¶ 6]. Klein asserts that he received the letter but did not sign it. [*Id.* at ¶ 6].

On May 26, 2017, Newly Weds' attorney sent Klein a letter asserting that his retention of the CDs violated the non-disclosure/confidentiality agreement he signed when he was hired by Newly Weds in 1997 as well as unspecified portions of Newly Weds' employee handbook. [*Pl./Counter-Deft.'s SO*F at ¶ 35]. Klein's attorney declined to turn over the files since they could be used in his lawsuit, but agreed to make the CDs available for copying. [*Id.* at ¶ 36]. On January 4, 2018, the parties subsequently entered into an agreement concerning the documents and electronic information. [*Id.* at ¶ 37].

## I.      LEGAL STANDARD

Summary judgment is appropriate where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, the Court must view the facts and draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The movant bears the initial burden of proving that no genuine issue of material fact exists and

that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial," *Anderson*, 477 U.S. at 256, and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The mere existence of an alleged factual dispute is insufficient to defeat a motion for summary judgment. *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002).

## II.     ANALYSIS

### A. Age Discrimination

Klein alleges that Newly Weds discriminated against him in violation of the ADEA when it terminated his employment. A plaintiff seeking to recover for disparate treatment under the ADEA must show that the evidence, taken as a whole, would demonstrate to a reasonable fact finder that age caused an adverse employment action, *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), and must "prove, by a preponderance of the evidence, that age was the 'but for' cause of the [ ] action." *Carson v. Lake County., Indiana*, 865 F.3d 526, 532 (7th Cir. 2017) (applying *Ortiz* to ADEA claims). While the Seventh Circuit has eliminated the distinction between "direct" and "circumstantial" evidence, *see Ortiz*, 834 F.3d at

765, this decision does not preclude the *McDonnell Douglas* burden shifting framework for employment discrimination cases. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

The *McDonnell Douglas* framework places an initial burden on the plaintiff to establish a prima facie case of discrimination. To do so, Klein must set forth evidence that (1) he is a member of a protected class, (2) his job performance met Newly Weds' legitimate expectations, (3) he suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than he was. *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017). If Klein establishes a prima facie case, Newly Weds must rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the employment decision. *Id*. The burden then shifts back to Klein to show that the stated reason is pretextual, which permits "an inference of unlawful discrimination." *Id*.

A court can consider the evidence through the *McDonnell Douglas* framework and then perform a cumulative assessment of the evidence to determine whether a reasonable fact finder could determine that Klein was terminated because of his age. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017)

***Prima Facie* Case**

Newly Weds concedes that Klein can show the first three elements in the *prima facie* analysis but argues that Klein cannot establish the fourth element. [Def. Br. at 8-9; Doc. No. 77]. While Newly Weds concedes that Klein's performance was meeting its legitimate expectations as they existed up to the time that Newly Weds began its reorganization, Newly Weds asserts that its expectations changed as the role envisioned for Klein was eliminated when it was determined that the position that best suited Klein's strengths simply was not consistent with Newly Weds' "DNA." Newly Weds maintains that age played no role in Klein's termination, and that Klein was terminated due to his position being eliminated as part of the reorganization of the department in which he worked.

Since the first three elements of the *prima facie* analysis are undisputed, where Klein's position has been eliminated and his duties have been absorbed by retained employees not in the protected class, he must show that similarly situated younger employees were treated more favorably. *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 690 (7th Cir. 2006). Klein alleges that the day after his termination, his responsibilities were immediately given to Kelecich, an R&D director who had no scientific or technical background or advanced degrees. Kelecich was immediately given an assistant, Bagley, and Klein's direct reports, Wang and Schranz, were reassigned to Kelecich and Bagley and continued to perform the same duties they had done under Klein. Kelecich's former job as an R&D director was given to Lawson, a Senior R&D manager who was 12 years' Kelecich's junior.

Newly Weds contends that the individuals Klein identified as similarly situated – Kelecich, Bagley, Lawson, Gorski, and Polcyn – were in fact not similarly situated and the fact that they remained employed at Newly Weds following the reorganization does not support Klein's *prima facie* case.

Based on the evidence, Newly Wed's argument is not persuasive. The evidence shows that prior to his termination, Klein was performing many of the functions that the Continuous Improvement Group was created to handle – which was head by Kelecich. [*Pl.'s Resp. to Deft.'s SOF* at ¶ 22, Ex. M (NWF 1250)]. Bagley was immediately hired after Klein's termination, and Newly Weds concedes that certain of Klein's direct reports were reassigned to Gorski and Kelecich/Bagley. [*Deft.'s Resp. to Pl.'s Sup. SOF* at ¶ 10]. Although Newly Weds contends that most of these shifts took place several months before Klein's position was eliminated, the contention falls short of viewing the evidence in the light most favorable to Klein. Kelecich, who was 52 at the time, transitioned into a role – albeit new or not – that assumed some of the functions Klein had performed with staff who had previously directly reported to Klein. *See Cianci v. Pettibone Corp.*, 152 F.3d 723, 728 (7th Cir. 1988) (An employee over the age of 40 can be substantially younger when there is a 10 year difference between the plaintiff and his replacement); *see also David*, 846 F.3d at 225-26 (Whether employers are similarly situated is a flexible, common sense, and factual inquiry). Although Kelecich did not assume all of Klein's duties and roles, Klein has enough evidence to show that some of his duties were

transitioned to a younger employee. And, he is thus able to make out a *prima facie* case of discrimination.

## Nondiscriminatory Reason for Termination

Once an employee establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the firing. *David*, 846 F.3d at 225. Newly Weds has done so here. According to Newly Weds, Beekman was hired to lead the reorganization of the R&D department. As part of that reorganization, Beekman sought to determine how to best utilize the strengths of employees within the R&D department, and determined that Klein's strength was coming up with new ideas. Beekman set out to design a role that played to Klein's strengths, but it was further determined that this role was simply not part of Newly Wed's "DNA" and Klein was terminated. Newly Weds reorganized its entire R&D department in both Chicago and in other facilities throughout the United States – with over 60 positions impacted. There were newly created roles, shifts in positions, and eliminated positions. This is sufficient to show that there was a legitimate, nondiscriminatory reason for terminating Klein's employment. *See Scruggs v. Gerst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009) (An employer may eliminate a position as part of restructuring and may decide to fill a new position with a better qualified person).

**Pretext**

Lastly, the burden shifts back to Klein to provide enough evidence from which a reasonable jury could find that Newly Weds' proffered reason for his firing is a pretext for discrimination. *Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1005 (7th Cir. 2001). To establish pretext, Klein must show that Newly Weds' reason for his termination "was a lie—not just an error, oddity, or oversight." *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010). Showing pretext "requires proof that the defendant's explanation is unworthy of credence." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008) (quotations and citations omitted). A court looks for evidence that the employer "is dissembling to cover up a discriminatory purpose.*" David*, 846 F.3d at 229. When an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not the Court's province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it was truly the reason for plaintiff's termination. *Reyno v. PNB Remittance Centers, Inc.*, 2011 WL 3021300, at *8 (N.D. Ill. July 22, 2011) (quotations and citations omitted).

Newly Weds justifies Klein's termination as part of a reorganization effort of over 60 positions in the R&D department of the company, at least three of which positions resulted in the termination of an employee. [*Deft.'s Resp. to Pl.'s Sup. SOF* at ¶ 1, Ex. L (NWF 384-393); Ex. M (NWF 1209, 1211, 1217, 1948, 2021, 2024); Ex. P]. While Klein was not immediately terminated at the commencement of the reorganization, he was ultimately terminated, according to Newly Weds, because

the new role contemplated for Klein was incompatible with the new vision for the company. [*Deft.'s SOF* at ¶¶ 43, 44].

In support of pretext, Klein focuses on the internal email from Beekman dated April 10, 2015, placing Klein on a six-month test to determine if he could perform in the role that Beekman contemplated for him upon reorganization, stating that if Klein "cannot function in the role I will put a person in place who can." [*Pl.'s Resp. to Deft.'s SOF* at ¶ 14, Ex. M (NWF 1541)]. Klein argues that this, coupled with the speed to which the reorganizational effort of removing staff from under him commenced, "raises skepticism as to the sincerity of the reorganization." There is no dispute that staff previously under Klein continued with some of the same duties they now perform under new supervisors. Pointedly, Klein emphasizes that Lawson, one of the new supervisors of an employee previously working under Klein, is 40 years of age. As to the Beekman email, there is no suggestion in this email (or in any other evidence) that Klein was under scrutiny because of his age. And, the evidence that other younger supervisors remained after reorganization is not sufficient evidence of pretext.

Klein also believes that Newly Weds has had shifting justifications for his termination. Shifting or changing stories by an employer regarding the circumstances of the employee's separation can be evidence of pretext. *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013). Klein points to three other reasons he says Newly Weds provided to the EEOC during their investigation as evidence of pretext. Klein argues the following inconsistencies: 1) that Newly Weds

told the EEOC that Klein's entire group had been eliminated after the reorganization [*Pl.'s Resp. to Deft.'s SOF*, Ex. L (NWF 373)]; 2) that Newly Weds told the EEOC that 60 people experienced a change in their employment after reorganization [*id.*]; and 3) that the EEOC was told that another employee had been fired for job performance. [*Id.* at Ex. L (NWS 376)]. Klein also asserts that, in addition to citing the reorganization, Newly Weds also referenced that he did not complete his projects fast enough. [Pl. Br. at 14; Doc. No. 91].

The record shows that Newly Weds has consistently said it terminated Klein pursuant to a reorganization. [*Deft.'s Resp. to Pl.'s Sup. SOF* at ¶ 1, Ex. L (NWF 373, 377-378, 384-393); Ex. M (NWF 1209, 1211, 1217, 1948, 2021, 2024); *Deft.'s SOF* at ¶¶ 43, 44]. Moreover, the evidence demonstrates that Klein was terminated because of the reorganization, not because his performance was unsatisfactory or that he would have been terminated absent the reorganization. [*Deft.'s Resp. to Pl.'s Sup. SOF* at ¶¶ 20-26].

Newly Weds advising the EEOC that 60 people experienced a change in their employment is not a shifting explanation. It is a consistent explanation. Ultimately, 60 employees were affected by the reorganization – it is at least three with termination and the remainder with different job functions and/or different supervisory structures. [*Deft.'s Resp. to Pl.'s Sup. SOF* at ¶ 1, Ex. L (NWF 373-379, 384-393); Ex. P].

Lastly, Klein extensively argues that he was an exemplary employee, which is indeed supported by the record and acknowledged by Newly Weds. But, Newly

Weds does not argue that it terminated Klein for poor performance, so this, too, fails to shift the pendulum in Klein's direction.

When taking Klein's evidence in the light most favorable to him, his evidence of pretext is thin. His effort to show pretext is undermined by his admission that he had discussions with Theiss regarding the need to improve headcount through improved workflow between the RTIS Group and the rest of R&D prior to Beekman being hired. Klein also had conversations with Beekman about what his new role would entail and the different changes to the office that would occur. Klein knew early on in the reorganization process that certain people who reported to him were going to be reassigned within a different reporting system and agreed that the shift of these employees was a "reasonable decision of management."

As part of the reorganization, it was determined that Klein's strengths as an employee did not align with Newly Wed's "DNA." Klein himself acknowledged that Newly Weds is customer-driven company. Further, Klein admitted that he was not better suited than Lawson for the new role he was appointed to in the reorganization, which included some of Kelecich's prior responsibilities, and that he would not have been better taking on the responsibilities assigned to Gorski than she was. Drawing all reasonable inferences in Klein's favor, *Carson v. Lake County, Indiana*, 865 F.3d 526, 533 (7th Cir. 2017), Klein has failed to provide evidence that a reasonable fact finder could conclude that his termination was pretextual and that he was actually fired because of his age.

**Cumulative Assessment of the Evidence**

Although Klein's claim has failed to pass the *McDonnell Douglas* test, the Court must also weigh whether Klein's evidence would cause a reasonable fact finder to determine that his age was the cause of his termination. *Aberman v. Bd. of Educ. of City of Chicago*, 242 F. Supp. 3d 672, 686-87, 690-91 (N.D. Ill. 2017) (after addressing the *McDonnell Douglas* test, cumulatively assessing "all the evidence" to determine if the plaintiff could prove his age discrimination case at trial).

Taking all of Klein's facts in the most favorable light, the Court still is not inclined to believe that Newly Weds reorganized its entire R&D department in both Chicago and in other facilities throughout the United States – with over 60 positions impacted – simply as a pretext to firing Klein. Various positions were created and responsibilities were reassigned months before the decision to terminate Klein's employment was made. Accordingly, because Newly Weds articulated a legitimate, non-discriminatory reason for terminating Klein, and Klein was unable to counter with evidence that would allow a reasonable juror to find that Newly Wed's proffered justification was pretextual, Newly Wed's motion for summary judgment is granted.

**B. State Law Claims**

Given the foregoing conclusion that Newly Weds is entitled to summary judgment on Klein's federal claim, the Court must decide whether to exercise its supplemental jurisdiction over Newly Wed's state law counterclaims. Where a

district court has original jurisdiction over some claims, it has supplemental jurisdiction over claims that are so related that they form part of the same case or controversy. 28 U.S.C. § 1367(a); *Aberman*, 242 F. Supp. 3d at 694. If the court has dismissed all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c)(3). As the Seventh Circuit has consistently stated, "[I]t is well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Aberman*, 242 F. Supp. 3d at 694 (citations omitted); *see also Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) ("As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendant state claims."). As summary judgment has been granted on all federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law counterclaims and dismisses them as such.

## CONCLUSION

For the foregoing reasons, Newly Weds Food Inc.'s Motion for Partial Summary Judgment [Doc. No. 76] is granted and Plaintiff/Counter-Defendant's Motion for Summary Judgment on Defendant/Counter-Plaintiff's Counterclaims [Doc. No. 95] is dismissed without prejudice.

**SO ORDERED.**                         **ENTERED:**


**DATE:**  <u>September 10, 2019</u>     _____
                                         **HON. MARIA VALDEZ**
                                         **United States Magistrate Judge**